**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| PRESCILA LOVELL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TRANSUNION LLC,<br><br>Defendant. | Case No. |

**CLASS ACTION COMPLAINT**

Plaintiff Prescila Lovell, individually and on behalf of all others similarly situated, ("Plaintiff") brings this action against TransUnion LLC ("TransUnion" or "Defendant"). Plaintiff's allegations are based upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery.

**INTRODUCTION**

1. TransUnion is a global information and insights company, and one of the three major credit bureaus in the United States, providing credit and public record data to businesses and consumers. TransUnion offers a variety of services, including credit risk management, fraud prevention services, identity verification, and marketing and analytics information to support individuals and organizations. TransUnion also offers many consumer-facing tools such as credit monitoring, fraud alerts, and personalized credit offers. To conduct business, TransUnion maintains extensive credit files on over one billion consumers worldwide, with 200 million based in the United States, including information related to their credit history and financial activity.

TransUnion has operated for over 50 years as a credit reporting agency, operating in 30 countries and accumulating a customer base of over 65,000 businesses globally, including lenders, insurers, and employers.

2. It plays a central role in the modern American economy, collecting and selling vast amounts of data about the most important details of consumers' financial lives. This data – names, birthdays, social security numbers, driver license numbers, and more – contain the keys that unlock a consumer's identity and are relied upon by third parties to make major financial decisions affecting almost all Americans.

3. TransUnion understood it had an enormous responsibility to protect the data it collected, and assured the public that it "is committed to data privacy"[1] and that it "secure[s] and protect[s] the information entrusted to [it] by building, monitoring and defending security ecosystem built on a foundation of compliance and accountability."[2] But, as recently acknowledged, it has not lived up to that responsibility or fulfilled its public assurances to protect Americans' confidential information, compromising the personal information of millions of consumers (the "Data Breach"), announced by Defendant on August 26, 2025.[3]

4. TransUnion failed to properly secure and safeguard the highly valuable, PII of millions of US consumers, including their names, Social Security numbers, dates of birth, phone numbers, home addresses, and other personal information (collectively, "Private Information" or "PII")[4]. TransUnion also failed to comply with industry standards to protect information systems that contain Private Information and failed to provide timely and adequate notice to Plaintiff and

[1] *Consumer Privacy Rights,* TRANSUNION (2025), https://www.transunion.com/consumer-privacy.
[2] *Data Security,* TRANSUNION (2025), https://www.transunion.com/client-support/data-security.
[3] *Data Breach Notifications,* OFFICE OF THE MAINE ATTORNEY GENERAL (August 26, 2025), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html.
[4] Adam Hardy, *Credit Bureau TransUnion Confirms Data Breach Affecting Over 4 Million People,* MONEY (August 29, 2025), https://money.com/transunion-data-breach/#:~:text=TransUnion%20confirmed%20an%20unauthorized%20%E2%80%9Ccyber,according%20to%20the%20Texas%20filing.

other members of the Class that their Private Information had been accessed and compromised.

5. As a result of TransUnion's inadequate security and breach of its duties and obligations, the Private Information of Plaintiff and Class Members was compromised through disclosure to an unauthorized criminal third party. Plaintiff and Class Members have suffered injuries as a direct and proximate result of Defendant's conduct. These injuries include: (i) out-of-pocket expenses associated with preventing, detecting, and remediating identity theft, social engineering, and other unauthorized use of their Private Information; (ii) opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) the continued, long term, and certain increased risk that unauthorized persons will access and abuse Plaintiff's and Class Members' Private Information; (iv) the continued and certain increased risk that the Private Information that remains in Defendant's possession is subject to further unauthorized disclosure for so long as Defendant fails to undertake proper measures to protect the Private Information; (v) invasion of privacy and increased risk of fraud and identity theft; (vi) theft of their Private Information and the resulting loss of privacy rights in that information; (vii) diminution in value and/or lost value of Private Information, a form of property that Defendant obtained from Plaintiff and Class Members. This action seeks to remedy these failings and their consequences. Plaintiff and Class Members have a continuing interest in ensuring that their Private Information is and remains safe, and they should be entitled to injunctive and other equitable relief.

6. Even the most fundamental Private Information becomes especially valuable to cybercriminals to create seemingly legitimate, personalized phishing scams. This exfiltrated personal data—the full extent of which TransUnion has failed to disclose to the public—allows hackers to gain a clear image of each individual and track their whereabouts, leading hackers to each victim's behavior and background. The combined exfiltrated data effectively provides criminals with a key to their personal lives, making it easy to match additional data, gaining access to their personal accounts and insight on their preferences. Hackers are now able to build a three-

dimensional picture and thereby exploit the consumer information exfiltrated from TransUnion.

7. This data breach was preventable because it resulted from well-known and avoidable failures in cybersecurity. TransUnion failed to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; provided excessive access permissions to staff or other agents; and failed to properly train and audit its staff and employees on proper security measures, especially in regard to phishing attacks.

8. This Data Breach was preventable because it resulted from well-known and avoidable failures in cybersecurity. TransUnion failed to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failed to maintain industry-standard safeguards and protections, ensure strict vendor oversight, limit the access controls to minimize intrusion/breach; failed to require repeated/regular password resets by staff/vendors; failed to properly train and audit its staff and employees on proper security measures to ensure compliance; failed to encrypt the data it maintained on its servers; and failed to establish adequate safeguards preventing extraction of large amount of data.

9. In addition, TransUnion failed to properly monitor its computer network and systems that housed the Private Information. If it had properly monitored these electronic and cloud-based systems, it would have discovered the intrusion sooner or prevented it altogether.

10. Plaintiff brings this lawsuit on behalf of herself and all those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained. To remedy these violations of law, Plaintiff and Class Members thus seek actual damages, statutory damages, restitution, and injunctive and declaratory relief (including significant improvements to Defendant's data security protocols and employee training practices), reasonable attorneys' fees, costs, and expenses incurred in bringing this action, and all other remedies this Court deems just and proper.

## PARTIES

### I. Plaintiff

11. **Plaintiff** Prescila Lovell is a natural person and resident of California. Defendant collected, stored, maintained, processed, and compiled information on Plaintiff and other Class Members for its own commercial benefits. Plaintiff Lovell reasonably expected that Defendant would use proper security measures to protect her Private Information and prevent its access by unauthorized third parties.

12. Plaintiff received a data breach notification letter from TransUnion dated August 26, 2025. ("Notification Letter"). The letter indicated that Plaintiff's information had been stolen in a breach of TransUnion's computer systems and as a result, her personal information, including but not limited to her date of birth and social security number, was now controlled by one or more criminal third parties.

13. As a result of the Data Breach, Plaintiff has been further injured by the damages to and loss in value of her Private Information—a form of intangible property that Defendant possessed and should have kept secure. This information has inherent value that Plaintiff was deprived of when her Private Information was negligently made accessible to and intentionally and maliciously exfiltrated by cybercriminals.

14. When Plaintiff's Private Information was accessed and obtained by a third party without her consent or authorization, Plaintiff suffered injury from a loss of privacy.

15. Given the highly sensitive nature of the information involved, the Data Breach has also caused Plaintiff to suffer imminent harm arising from a substantially increased risk of additional fraud, identity theft, financial crimes, and misuse of her Private Information. This highly sensitive information is now in the hands of criminals as a direct and proximate result of Defendant's misconduct. It is also possible that other forms of information not yet disclosed by Defendant were also lost in the breach.

16. As a result of the actual harm Plaintiff has suffered and the imminent and substantial risk of future harm, the Data Breach has forced, and will force, Plaintiff to spend significant time and energy dealing with issues related to the Data Breach.

**II. <u>Defendant</u>**

17. **Defendant** TransUnion LLC is a Delaware limited liability company, with its principal place of business in Chicago, Illinois. Defendant is one of the "Big Three" credit bureaus in the United States, and, as a result, collects, processes, and stores the information of approximately 200 million Americans, compiling that information into consumer reports which it then sells to 65,000 businesses, including lenders, insurers, and employers, for purposes such as credit risk assessment, fraud prevention, and identity verification.[5]

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(d) because this is a class action where the aggregate amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendant. This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

19. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District. Defendant's principal place of business is located in this District from where its board of directors and/or officers direct Defendant's activities including to their actions and inactions leading to the data breach at issue, Defendant gains revenue and profits from doing business in this District, and Class Members were affected by the breach from TransUnion's actions and inactions directed from this District.

---

[5] Bill Toulas, *TransUnion suffers data breach impacting over 4.4 million people,* BLEEPINGCOMPUTER (August 28, 2025), https://www.bleepingcomputer.com/news/security/transunion-suffers-data-breach-impacting-over-44-million-people/.

## FACTUAL ALLEGATIONS

20. TransUnion is a credit bureau. Defendant collects and processes the personal data of hundreds of millions of consumers across the country.

21. The information collected and stored by Defendant includes, but is not limited to, personal identifiers such as ***full names, dates of birth, Social Security Numbers (SSNs), home addresses, and contact information***, credit and financial information such as ***credit account information and balances, payment histories and delinquencies, and credit inquiries and applications***, employment information such as ***current and past employers***, and identity verification data such as ***government-issued ID information, device information***, and more.[6]

22. Defendant holds itself as a trustworthy company, which recognizes and values consumer privacy and personal information and has repeatedly assured consumers that "[d]ata security and stewardship is vital to consumer protection and enabling trust. At TransUnion, we continually invest in improvements to protect the data we hold on behalf of consumers and businesses." Similarly, TransUnion claims to "secure and protect the information entrusted to us by building, monitoring and defending security ecosystem built on a foundation of compliance and accountability. We proactively manage our programs and continuously invest to secure the data we hold on behalf of consumers and businesses."[7]

23. Plaintiff and other similarly situated consumers relied to their detriment on Defendant's uniform representations and omissions regarding data security, including Defendant's failure to alert consumers that its security protections were inadequate, and that Defendant would forever store Plaintiff's and Class Members' Private Information, failing to archive it, protect it, or at the very minimum warn consumers of the anticipated and foreseeable data breach.

### I. <u>The Data Breach</u>

24. At all material times, TransUnion failed to maintain proper security measures despite its promises of safety and security to consumers.

---

[6] *TransUnion Consumer Interactive Privacy Notice,* TRANSUNION (2025), https://www.transunion.com/privacy/consumer-interactive.

[7] *Data Security,* TRANSUNION (2025), https://www.transunion.com/client-support/data-security.

25. On July 30, 2025, Defendant learned that an account within its organization, later confirmed to be with Salesforce, had been compromised by an organized cybercrime group two days earlier, on July 28, 2025, exposing the personal information of over 4.4 million individuals across the United States.[8]

26. Defendant failed to immediately notify those affected by the breach. Despite being informed of the cyberattack on July 30, 2025, Defendant kept silent and chose not to notify the affected consumers until almost a month later on August 26, 2025, when Defendant finally began notifying consumers, including Plaintiff, of the Data Breach by mail.

27. Despite the fact that the personal information, including Social Security numbers, of 4.4 million US consumers, was breached, Defendant described the data exposed in the incident as "limited."

28. In its statement, Defendant failed to provide all relevant information regarding the Data Breach. Instead, Defendant downplayed the extent of the Data Breach, and the likely harm affected victims may experience.

**II. <u>Data Breaches and the Market for PII</u>**

29. It should be no surprise that in today's digital economy, "a new form of black gold has emerged, one that is intangible yet infinitely more powerful: data."[9] Personal data has become a "precious commodity," at the forefront of technological innovation.[10] Data is a pivotal economic asset and form of capital, allowing companies rich in it to drive competition. Considering the implications of "big data" in corporate America and the consequences of cyber thefts, which include heavy prison sentences, the value of data is axiomatic. Even this obvious risk-to-reward analysis illustrates beyond doubt that personal information has considerable market value.

---

[8] Bill Toulas, *TransUnion suffers data breach impacting over 4.4 million people,* BLEEPINGCOMPUTER (August 28, 2025), https://www.bleepingcomputer.com/news/security/transunion-suffers-data-breach-impacting-over-44-million-people/.

[9] Lawrence Teixeira, *The New Black Gold: How Data Became the Most Valuable Asset in Tech*, MEDIUM (Feb 12, 2024), http://tiny.cc/fjas001.

[10] *Id.*

30. In a consumer-driven world, the ability to capture and use consumer data to shape products, solutions, and the buying experience is critically important to a business's success.[11] Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin"[12] and that "[d]ata-driven companies are 23 times more likely to top their competitors in customer acquisition, about 19 times more likely to stay profitable and nearly seven times more likely to retain customers."[13]

31. Indeed, an entire economy exists related to the value of personal data. In 2023, the big data technology market was valued at roughly $349 billion, and that value is expected to grow from roughly $397 billion in 2024 to $1,194 billion by 2032.[14]

32. In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[15] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[16] OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e. $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number

[11] Laci Loew, *Data Differentiation: Why Consumer Data Is A Modern Organization's Real Competitive Advantage*, FORBES (October 2, 2024), https://www.forbes.com/councils/forbescommunicationscouncil/2024/10/02/data-differentiation-why-customer-data-is-a-modern-organizations-real-competitive-advantage/

[12] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, *Capturing value from your customer data*, MCKINSEY (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data

[13] Laci Loew, *Data Differentiation: Why Consumer Data Is A Modern Organization's Real Competitive Advantage*, FORBES (October 2, 2024), https://www.forbes.com/councils/forbescommunicationscouncil/2024/10/02/data-differentiation-why-customer-data-is-a-modern-organizations-real-competitive-advantage/.

[14] *Big Data Technology Market Size, Share & Industry Analysis*, FORTUNE BUSINESS INSIGHTS (Jan. 2025), https://www.fortunebusinessinsights.com/industry-reports/big-data-technology-market-100144

[15] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, NO. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[16] *Id.* at 25.

and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military [record] is estimated to cost USD 55."[17]

33. Consumer concern for how companies use their data is on the rise. According to Pew Research, 81% of U.S. adults are concerned about how companies use the data they collect about them.[18] Consumers increasingly say they don't understand what companies are doing with their data, with 67% of U.S adults saying they understand little to nothing about what companies are doing with their personal data, up from 59% in 2019.[19]

34. Data breaches in the United States have become commonplace – the number of breached records increased from 168 million in 2023 to more than 247 million in 2024 – with the goal of criminals being to monetize the stolen data.[20]

35. When a victim's data is compromised in a breach, the victim is exposed to serious ramifications regardless of the sensitivity of the data, including but not limited to identity theft, fraud, decline in credit, inability to access healthcare, as well as legal consequences.[21]

36. The U.S. Department of Justice's Bureau of Justice Statistics has found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that resolution of those problems could take more than a year.[22] Indeed,

---

[17] *Id.*

[18] *How Americans View Data Privacy,* PEW RESEARCH CENTER (Oct. 18, 2023), https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/; *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[19] I*d.*

[20] *More Than 1.7 Billion Individuals Had Personal Data Compromised in 2024*, THE HIPAA JOURNAL, (Jan. 2025), https://www.hipaajournal.com/1-7-billion-individuals-data-compromised-2024/#:~:text=In%202024%2C%206%20data%20breaches,to%20two%20colossal%20data%20breaches.

[21] *Data Breach Response: A Guide for Business*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business

[22] *Victims of Identity Theft*, U.S. DEPARTMENT OF JUSTICE, (Sept. 2015), http://www.bjs.gov/content/pub/pdf/vit14.pdf

data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.

37. The U.S. Government Accountability Office (GAO) has concluded that it is common for data thieves to hold onto stolen data for extended periods of time before utilizing it for identity theft.[23] In the same report, the GAO noted that while credit monitoring services can assist with detecting fraud, those services do not stop it.[24]

38. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and financial fraud.[25] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII on multiple underground Internet websites, commonly referred to as the "dark web."

39. Further, criminals often trade stolen PII on the "cyber black-market" for years following a breach. Cybercriminals can post stolen PII on the internet, thereby making such information publicly available.

40. When companies entrusted with personal data fail to implement industry best practices, cyberattacks and other data exploitations can go undetected for a long period of time. This worsens the ramifications and can even render the harm irreparable.

41. PII is a valuable commodity for which a black market exists on the dark web, among other places. Personal data can be worth from $1,000 or more on the dark web[26] [27] and the legitimate data brokerage industry is valued at more than $250 billion.

---

[23] *Data Breaches – Range of Consumer Risks Highlights Limitations of Identity Theft Services*, U.S. GOVERNMENT ACCOUNTABILITY OFFICE, https://www.gao.gov/assets/700/697985.pdf

[24] *Id.*

[25] *What To Know About Identity Theft*, FEDERAL TRADE COMMISSION, https://consumer.ftc.gov/articles/what-know-about-identity-theft

[26] Ryan Smith, *Revealed-how much is personal data worth on the dark web?*, INSURANCE BUSINESS MAGAZINE, (May 2023), https://www.insurancebusinessmag.com/ca/news/cyber/revealed--how-much-is-personal-data-worth-on-the-dark-web-444455.aspx.

[27] Maria LaMagna, *The sad truth about how much your Google data is worth on the dark web*, MARKETWATCH, (June 2018), https://www.marketwatch.com/story/spooked-by-the-facebook-

42. In this black market, criminals seek to sell the spoils of their cyberattacks to identity thieves who desire the data to extort and harass victims, take over victims' identities in order to open financial accounts and otherwise engage in illegal financial transactions under the victims' names.

43. PII has a distinct, high value—which is why legitimate companies and criminals seek to obtain and sell it. As alleged in more detail below, a growing market is for individuals' data.[28]

44. In a study authored by Tim Morey, researchers studied the value that 180 internet users placed on keeping personal data secure.[29] Social security numbers and government ID information were valued at $240 per year. *See true and correct findings of summary below*:




45. Defendant knew or should have known that Plaintiff's and Class Members' Private Information is valuable, both to legitimate entities, like Defendant, and to cybercriminals.

---

privacy-violations-this-is-how-much-your-personal-data-is-worth-on-the-dark-web-2018-03-20; Emily Wilson, *The Worrying Trend of Children's Data Being Sold on the Dark Web*, TNW (February 23, 2019), https://thenextweb.com/contributors/2019/02/23/children-data-sold-the-dark- web/

[28] *Id.*

[29] Tim Morey, *What's Your Personal Data Worth?*, DESIGN MIND, (Jan. 2011), https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039s-your-personal-data-worth.html

46. Defendant knew or should have known that Plaintiff and Class Members would reasonably rely upon and trust Defendant's promises regarding security and safety of their data and systems, and that their valuable Private Information would be protected.

47. By collecting, using, selling, monitoring, and trafficking Plaintiff's and other consumers' Private Information, and failing to protect it by maintaining inadequate security systems, failing to properly archive the Private Information, allowing access of third parties, and failing to implement adequate security measures, Defendant caused harm to Plaintiff and other consumers TransUnion held Private Information on.

**III. <u>Defendant's Duty to Safeguard Private Information</u>**

48. Defendant collects, receives, and accesses consumers' extensive individually identifiable information. This Private Information includes full names, home addresses, dates of birth, Social Security numbers, other contact information, government-issued identification information, employment information, and more.

49. Defendant was prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that an entity's failure to maintain reasonable and appropriate data security for individuals' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.,* 799 F.3d 236 (3d Cir. 2015).

50. The FTC has brought enforcement actions against entities engaged in commerce for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

51. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all decision-making.[30]

52. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses.[31] The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

53. The FTC further recommends that entities not maintain PII longer than needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[32]

54. Furthermore, the FTC requires that entities like Defendant conduct risk assessments, implement and periodically review access control, encrypt consumer information, implement multi-factor authentication, dispose of consumer information securely, maintain a log of authorized users' activity and keep an eye out of unauthorized access, train employees regarding security awareness, conduct audits, penetration testing, and system wide scans regularly to test for publicly known security vulnerabilities – all of which if properly implemented would have allowed Defendant to prevent this Data Breach.

---

[30] *Start With Security*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed

[31] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business

[32] *Start With Security*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf

55. Defendant failed to properly implement basic data security practices, allowing for this data breach to occur, victimizing millions of people – by failing to adhere to many of the FTC protocols and allowing access to a hacker who was able to exfiltrate substantial amounts of consumer data. Defendant should have a multifaceted security protocol in place, but failed to do so. Had Defendant maintained proper protocols and regularly conducted audits to ensure its vulnerabilities and training, it would have prevented this Data Breach.

56. Plaintiff and Class Members had the reasonable expectation that TransUnion would comply with its obligations to keep such information confidential and secure from unauthorized access.

57. TransUnion's failure to provide adequate security measures to safeguard Plaintiff's and Class Members' Private Information is especially egregious because it operates in a field which has recently been a frequent target of scammers attempting to gain access to confidential PII.

58. Though TransUnion has not provided sufficient information as to how the Data Breach occurred, there is evidence that the information was stolen via a voice phishing a/k/a "vishing" attack by ShinyHunters, a major cybercriminal group that has been responsible for numerous other attacks in the past.[33] Thus, Defendant should have been aware of proper methods to ensure data safety and security, but failed to do so.

## IV. <u>Impact of the Data Breach on Consumers</u>

59. Plaintiff and the Class have suffered actual harm as a result of Defendant's conduct. Defendant failed to institute adequate security measures that led to a data breach. This breach allowed hackers to access the Private Information, including the names, Social Security numbers, dates of birth, and other personal information of Plaintiff and the Class. Now that the Private Information has been accessed and absconded with, it is available for criminal elements to sell or

---

[33] Bill Toulas, *TransUnion suffers data breach impacting over 4.4 million people,* BLEEPINGCOMPUTER (August 28, 2025), https://www.bleepingcomputer.com/news/security/transunion-suffers-data-breach-impacting-over-44-million-people/.

trade and will continue to be at risk for the indefinite future. In fact, the U.S. Government Accountability Office found that, "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years."[34]

60. Plaintiff and Class Members are now vulnerable to a full gamut of cybercrimes, loss in value of their property, and have been forced to take remedial action, as listed below:

**Digital Phishing Scams**

61. Phishing scammers use emails and text messages to trick people into giving them their personal information, including but not limited to passwords, account numbers, and social security numbers. Phishing scams are frequently successful, and the FBI reported that people lost approximately $18.7 million to such scams in 2023 alone.[35]

62. Defendant knew or should have known of the dangers of digital phishing scams. When Personal Information is employed in a social engineering scheme, criminals can gain unfettered access to individuals, or corporate databases, as the Data Breach itself evinces.

63. Plaintiff and other consumers who lost information in the Data Breach are now more likely to become victims of digital phishing attacks because of the compromised information.

**SIM-Swap**

64. The data leak can also lead to SIM-swap attacks against Plaintiff and the Class Members. A SIM-swap attack occurs when the scammers trick a telephone carrier to porting the victim's phone number to the scammer's SIM card. By doing so, the attacker is able to bypass two-factor authentication accounts, as are used to access cryptocurrency wallets and other important accounts. The type of personal information that has been leaked poses a profound tangible risk of SIM-swap attacks for the Class.

65. Plaintiff and other consumers who lost information in the Data Breach are now more likely to become victims of SIM Swap attacks because of the released personal information.

[34] *See* U.S. GOV'T ACCOUNTABILITY OFF. REPORT TO CONGRESSIONAL REQUESTERS 29 2007. https://www.gao.gov/new.items/d07737.pdf.

[35] *Internet Crime Report*, FEDERAL BUREAU OF INVESTIGATION, (2023), https://www.ic3.gov/annualreport/reports/2023_ic3report.pdf scams

**Loss of Time**

66. As a result of this breach, Plaintiff and impacted consumers are likely to suffer unauthorized email solicitations and experience a significant increase in suspicious phishing scam activity via email, phone calls, and text messages following the breach. In addition, Plaintiff, as a result of the breach, has spent significant time and effort researching the breach, monitoring her accounts for fraudulent activity, and will continue to do so moving forward.

**Threat of Identity Theft**

67. As a direct and proximate result of Defendant's breach of confidence, and failure to protect Private Information, Plaintiff and the Class have also been injured by facing ongoing, imminent, impending threats of identity theft crimes, fraud, scams, and other misuse of this Private Information, resulting in ongoing monetary loss and economic harm, loss of value of privacy and confidentiality of the stolen Private Information, illegal sales of the compromised Private Information on the black market, mitigation expenses and time spent on credit monitoring, identity theft insurance, credit freezes/unfreezes, expenses and time spent in initiating fraud alerts, contacting third parties; decreased credit scores, lost work time, and other injuries. Defendant, through its misconduct, has enabled numerous bad actors to sell and profit off of Private Information that belongs to Plaintiff.

**Out of Pocket Costs**

68. Plaintiff is now forced to research and subsequently acquire credit monitoring and reasonable identity theft defensive services and maintain these services to avoid further impact. Plaintiff anticipates spending money out of pocket to pay for these services.

**Diminution in Value of a Valuable Property Right**

69. Because personal data is valuable personal property, market exchanges now exist where internet users like Plaintiff and Class Members can sell or monetize their own personal data.

70. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and

provides it to legitimate marketers or app developers.[36] For example, consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[37]

71. Accordingly, as a result of the Data Breach, Plaintiff lost the sale value of her Private Information and the opportunity to control how it is used. That a threat actor specifically targeted Defendant demonstrates just how valuable Plaintiff's Private Information can be to hackers and the significant value of Plaintiff's Private Information to cybercriminals.

**Summary of Actual Economic and Noneconomic Damages**

72. In sum, Plaintiff and similarly situated consumers were injured as follows:

i. Theft of their Private Information and the resulting loss of privacy rights in that information;

ii. Improper disclosure of their Private Information;

iii. Loss of value of their Private Information;

iv. The amount of ongoing reasonable identity defense and credit monitoring services made necessary as mitigation measures;

v. Defendant's retention of profits attributable to Plaintiff's and other consumers' Private Information that Defendant failed to adequately protect;

vi. Economic and non-economic impacts that flow from imminent, and ongoing threat of fraud and identity theft to which Plaintiff is now exposed;

vii. Ascertainable out-of-pocket expenses and the value of Plaintiff's time allocated to fixing or mitigating the effects of this data breach;

viii. Emotional distress, and fear associated with the imminent threat of harm from the continued phishing scams and attacks as a result of this data breach.

## V. Defendant Should Have Invested in Appropriate & Necessary Data Security

---

[36] *See*, *e.g.*, *The Personal Data Revolution*, DATACOUP, https://datacoup.com/

[37] Nielsen Computer & Mobile Panel, *Frequently Asked Questions*, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

73. In the years immediately preceding the Data Breach, Defendant knew or should have known that its computer systems were a target for cybersecurity attacks.

74. The FBI, FTC, GAO, U.S. Secret Service, United States Cybersecurity and Infrastructure Security Agency, State Attorney General Offices and many other government and law enforcement agencies, and hundreds of private cybersecurity and threat intelligence firms, have issued warnings that put Defendant on notice, long before the Data Breach, that (1) cybercriminals were ferociously aggressive in their pursuit of large collections of Private Information like that in possession of Defendant; (2) cybercriminals were selling large volumes of Private Information and corporate information on Dark Web portals; and (3) the threats were increasing.

75. Considering the information and warnings readily available to Defendant before the Data Breach, Defendant had reason to be on guard and to increase data security to avoid an attack.

76. Prior to the Data Breach, Defendant thus knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' Private Information could be accessed, exfiltrated and utilized by nefarious individuals as the result of a cyberattack.

77. Data security experts advise that "the vast majority of data breaches are preventable" if companies follow widely-available advice on data security practices, including "continually audit[ing] and reevaluat[ing]" their data security practices; being aware of and working proactively to counter cybercriminals' evolving techniques and approaches; and training and re-training their employees.[38]

78. Defendant did not follow this advice; nor did it heed warnings related to recent cybersecurity attacks from cybersecurity industry experts that the ShinyHunters cybercrime group, which confirmed its involvement in the TransUnion data breach, was increasingly targeting

---

[38] Nate Nead, *How To Prevent A Data Breach In Your Company*, FORBES (Jul. 30, 2021), https://www.forbes.com/sites/forbesbusinesscouncil/2021/07/30/how-to-prevent-a-data-breach-in-your-company/?sh=3828f7b918da

customers of Salesforce, which made Defendant a target as it uses software designed and hosted by Salesforce. Had Defendant properly prepared itself and its employees to comply with industry standards, this Data Breach would have been preventable.

## CLASS ALLEGATIONS

79. Plaintiff brings this action on her own behalf and on behalf of all other persons similarly situated. The Class which Plaintiff seeks to represent comprises:

> **All persons whose Private Information was accessed, compromised, or stolen in the Data Breach announced by TransUnion on August 26, 2025 (the "Class").**

This definition may be further defined or amended by additional pleadings, evidentiary hearings, a class certification hearing, and orders of this Court.

80. The Class is comprised of millions of consumers that TransUnion had gathered information and compiled reports on and were part of the Data Breach (the "Class Members"). The Class is so numerous that joinder of all members is impracticable and the disposition of their claims in a class action will benefit the parties and the Court.

81. There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented in that the Class was harmed by the same unfair and unlawful practices. The questions of law and fact common to the Class predominate over questions which may affect individual Class members. Common questions of law and fact include, but are not limited to, the following:

a. Whether Defendant's failure to implement effective security measures to protect Plaintiff's and the Class's Private Information was negligent;

b. Whether Defendant's conduct is an unlawful business act or practice within the meaning of California Business and Professions Code § 17200, *et seq*.;

c. Whether Defendant violated any statutory duties under the FTC Act, 15 U.S.C. §45, California's Customer Records Act, Cal. Civ. Code §1798.81.5, and California's Consumer Privacy Act, Cal. Civ. Code § 1798.100.

d. Whether Defendant represented to Plaintiff and the Class that it would protect Plaintiff's and the Class Members' Private Information;

e. Whether Defendant owed a duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

f. Whether Defendant breached a duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

g. Whether Class Members' Private Information was accessed, compromised, or stolen in the Data Breach;

h. Whether Defendant's conduct caused or resulted in damages to Plaintiff and the Class;

i. Whether Defendant failed to notify the public of the breach in a timely and adequate manner;

j. Whether Defendant knew or should have known that its systems, including but not limited to training protocols and policies, left it vulnerable to the Data Breach;

k. Whether Defendant adequately addressed the vulnerabilities that allowed for the Data Breach; and

l. Whether, as a result of Defendant's conduct, Plaintiff and the Class are entitled to damages and relief.

82. Plaintiff's claims are typical of the claims of the proposed Class, as Plaintiff and Class Members were harmed by Defendant's uniform unlawful conduct.

83. Plaintiff will fairly and adequately represent and protect the interests of the proposed Class. Plaintiff has retained competent and experienced counsel in class action litigation and other complex litigation.

84. Plaintiff and the Class have suffered injury because of Defendant's false, deceptive, and misleading representations and unlawful acts and practices.

85. The Class is identifiable and readily ascertainable. Notice can be provided to Class Members using techniques and a form of notice similar to those customarily used in class actions, and by internet publication, radio, newspapers, and magazines.

86. A class action is superior to other available methods for fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for proposed members of the Class to prosecute their claims individually.

87. The litigation and resolution of the Class's claims are manageable. Individual litigation of the legal and factual issues raised by Defendant's conduct would increase delay and expense to all parties and the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale, and comprehensive supervision by a single court.

88. Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Class as a whole. The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications with respect to individual member of the Class that would establish incompatible standards of conduct for Defendant.

89. Absent a class action, Defendant will likely retain the benefits of its wrongdoing. Because of the small size of the individual Class Members' claims, few, if any, Class Members could afford to seek legal redress for the wrongs complained of herein. Absent a representative action, Class Members will continue to suffer losses and Defendant (and similarly situated companies) will be allowed to continue these violations of law and to retain the proceeds of its ill-gotten gains.

**COUNT ONE**
**NEGLIGENCE**
**(ON BEHALF OF THE NATIONWIDE CLASS)**

90. Plaintiff, individually and on behalf of the Class, herein repeats, realleges and fully incorporates all allegations in all preceding paragraphs.

91. Defendant owed a duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information. This duty included but was not limited to: (a) designing, implementing, and testing security systems to ensure that consumers' Private Information was consistently and effectively protected; (b) implementing security systems that are compliant with state and federal mandates; (c) implementing security systems that are compliant with industry practices; and (d) promptly detecting and notifying affected parties of a data breach.

92. Defendant's duties to use reasonable care arose from several sources, including those described below. Defendant had a common law duty to prevent foreseeable harm to others, including Plaintiff and Class Members, who were the foreseeable and probable victims of any inadequate security practices.

93. Defendant had a special relationship with Plaintiff and Class Members, which is recognized by laws and regulations, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to class members from a data breach. Plaintiff and Class Members were compelled to entrust Defendant with their Private Information. At relevant times, Plaintiff and Class members understood that Defendant would take adequate security precautions to safeguard that information. Only Defendant had the ability to protect Plaintiff's and Class Members' Private Information it held.

94. Defendant knew or should have known that Plaintiff's and the Class Members' Private Information is information that is frequently sought after by criminals.

95. Defendant knew or should have known that Plaintiff and the Class members would suffer harm if their Private Information was leaked.

96. Defendant knew or should have known that its security systems were not adequate to protect Plaintiff's and the Class Members' Private Information from a data breach.

97. Defendant knew or should have known that adequate and prompt notice of the Data Breach was required such that Plaintiff and the Class could have taken more swift and effective action to change or otherwise protect their Private Information. Defendant failed to provide timely notice upon discovery of the data breach. Class Members were informed of the data breach on August 26, 2025, with not all receiving actual and direct notice, even though Defendant had learned of the data breach July 30, 2025.

98. Defendant's conduct as described above constituted an unlawful breach of its duty to exercise due care in collecting, storing, and safeguarding Plaintiff's and the Class Members' Private Information by failing to design, implement, and maintain adequate security measures to protect this information. Moreover, Defendant did not implement, design, or maintain adequate measures to detect a data breach when it occurred.

99. Defendant's conduct as described above constituted an unlawful breach of its duty to provide adequate and prompt notice of the data breach.

100. Plaintiff's and the Class Members' Private Information would have remained private and secure had it not been for Defendant's wrongful and negligent breach of its duties. The leak of Plaintiff's and the Class Members' Private Information, and all subsequent damages, was a direct and proximate result of Defendant's negligence.

101. Defendant's negligence was, at least, a substantial factor in causing Plaintiff's and the Class's Private Information to be improperly accessed, disclosed, and otherwise compromised, and in causing Class Members' other injuries arising out of the Data Breach.

102. The damages suffered by Plaintiff and the Class were the direct and reasonably foreseeable result of Defendant's negligent breach of its duties to adequately design, implement, and maintain security systems to protect Plaintiff's and Class Members' Private Information.

103. Defendant knew or should have known that its security for safeguarding Plaintiff's and Class Members' Private Information was inadequate and vulnerable to a data breach.

104. Defendant's negligence directly caused significant harm to Plaintiff and Members of the Class.

## COUNT TWO
## NEGLIGENCE PER SE
## (ON BEHALF OF THE NATIONWIDE CLASS)

105. Plaintiff, individually and on behalf of the Class, herein repeats, realleges and fully incorporates all allegations in all preceding paragraphs.

106. Defendant's violation of the FTC Act also constitutes negligence per se, as those provisions are designed to protect individuals like Plaintiff and the Class Members from the harm associated with data breaches.

107. Defendant violated the FTC Act, which obligates companies to use reasonable measures to protect PII, by failing to comply with applicable industry standards, and by unduly delaying reasonable notice of the actual breach. Defendant's conduct was particularly unreasonable given the nature and amount of PII obtained and stored, the foreseeable consequences of the data breach, and the exposure of Plaintiff's and Class Members' sensitive PII.

108. Defendant's violations of the FTC rules and other applicable standards constitute negligence per se.

109. Plaintiff and Class Members are within the category of persons the FTC Act was intended to protect.

110. The harm that occurred as a result of the Data Breach described herein is the type of harm the FTC Act was intended to guard against.

111. As a direct and proximate result of Defendant's negligence per se, Plaintiff and Class Members have been damaged as described herein, continue to suffer injuries as detailed above, are subject to the continued risk of exposure of their PII in Defendant's possession, and are entitled to damages in an amount to be proven at trial.

## COUNT THREE
## INVASION OF PRIVACY
## (ON BEHALF OF THE NATIONWIDE CLASS)

112. Plaintiff, individually and on behalf of the Class, herein repeats, realleges and fully incorporates all allegations in all preceding paragraphs.

113. Plaintiff and Class Members had a reasonable and legitimate expectation of privacy in their Private Information that Defendant failed to adequately protect against compromise from unauthorized third parties.

114. Defendant owed a duty to Plaintiff and Class Members to keep their Private Information confidential.

115. Defendant failed to protect, and released to unknown and unauthorized third parties, Plaintiff's and Class Members' Private Information.

116. By failing to keep Plaintiff's and Class Members' Private Information safe, knowingly utilizing unsecure systems and practices, Defendant unlawfully invaded Plaintiff's and Class Members' privacy by, among others, (i) intruding into Plaintiff's and Class Members' private affairs in a manner that would be highly offensive to a reasonable person; (ii) failing to adequately secure their Private Information from disclosure to unauthorized persons and/or third parties; and (iii) enabling the disclosure of Plaintiff's and Class Members' Private Information without consent.

117. Defendant knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiff's and Class Members' position would consider its actions highly offensive.

118. Defendant knew, or acted with reckless disregard of the fact that, organizations handling PII are highly vulnerable to cyberattacks and that employing inadequate security and training practices would render them especially vulnerable to data breaches.

119. As a proximate result of such unauthorized disclosures, Plaintiff's and Class Members' reasonable expectations of privacy in their Private Information was unduly frustrated and thwarted, thereby causing Plaintiff and the Class Members undue harm.

120. Plaintiff seeks injunctive relief on behalf of the Class, restitution, as well as any and all other relief that may be available at law or equity. Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause irreparable injury to Plaintiff and Class Members.

121. Plaintiff and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and the class.

**COUNT FOUR**
**UNJUST ENRICHMENT**
**(ON BEHALF OF THE NATIONWIDE CLASS)**

122. Plaintiff, individually and on behalf of the Class, herein repeats, realleges and fully incorporates all allegations in all preceding paragraphs.

123. Defendant funds its data security measures entirely from their general revenues, including payments made for information regarding Plaintiff and the Class Members.

124. TransUnion benefitted by the conferral upon it of Plaintiff's and Class Members' Private Information and by its ability to retain, use and profit from that information.

125. TransUnion also knew that Plaintiff's and Class Members' PII was private and confidential, and the value of this information was dependent on TransUnion maintaining the privacy and confidentiality of this information

126. In exchange, Plaintiff and Class Members should have had their PII protected with adequate data security measures.

127. Defendant knew that Plaintiff and the Class conferred a benefit which it accepted, and through which Defendant was unjustly enriched. Defendant profited from these transactions and used Plaintiff's and the Class Members' Private Information for business purposes and to increase its revenues.

128. Defendant enriched itself by saving the costs it reasonably should have spent on the necessary data security measures to secure Plaintiff's and the Class Members' PII. Instead of providing the necessary level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiff and the Class, by using ineffective security measures, failing to pay money for the much needed training of its employees, failing to conduct the audits, or implementing other security measures discussed above. Plaintiff

and the Class suffered an injury as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and training.

129. Under the principles of equity and good conscience, Defendant should not be permitted to retain this economic benefit, because it gained this economic benefit by failing to implement appropriate data management and security measures as mandated by common law and statutory duties.

130. Plaintiff and the Class have no adequate remedy at law as discussed above.

131. Defendant should be compelled to disgorge its profits and/or proceeds that it unjustly received as a result of failing to properly secure Plaintiff's and Class Members' Private Information.

**COUNT FIVE**
**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**(ON BEHALF OF THE NATIONWIDE CLASS)**

132. Plaintiff, individually and on behalf of the Class, herein repeats, realleges and fully incorporates all allegations in all preceding paragraphs.

133. The Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., authorizes this Court to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.

134. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

135. Defendant owes a duty of care to Plaintiff and Class Members which require it to adequately secure its Private Information when it chose to accept and store Plaintiff's and Class Members' Private Information.

136. Defendant still possesses Plaintiff's and Class Members' Private Information.

137. Defendant does not specify in the Data Breach notification what specific and verifiable steps it has taken to prevent a similar breach from occurring again.

138. Plaintiff and Class Members are at risk of harm due to the exposure of their Private Information and the Defendant's failures to address the security failings that lead to such exposure.

139. An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class Members' Private Information and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and the Class from further data breaches that compromise their Private Information.

140. Plaintiff and the Class, therefore, seek a declaration that (1) each of Defendant's existing security measures do not comply with its obligations and duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect consumers' Private Information, and (2) to comply with its duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

a. Prohibiting Defendant from engaging in the wrongful acts stated herein (including Defendant's utter failure to provide notice to all affected consumers);

b. Requiring Defendant to implement adequate security protocols and practices to protect consumers' Private Information consistent with the industry standards, applicable regulations, and federal, state, and/or local laws;

c. Mandating proper notice be sent to all affected consumers, and posted publicly;

d. Requiring Defendant to protect all data collected;

e. Requiring Defendant to delete, destroy, and purge the Private Information of Plaintiff and Class Members unless Defendant can provide reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

f. Requiring Defendant to implement and maintain a comprehensive security program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' Private Information;

g. Requiring Defendant to engage independent third-party security auditors and conduct internal security audit and testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis;

h. Requiring Defendant to engage independent third-party security auditors and/or internal personnel to run automated security monitoring;

i. Requiring Defendant to create the appropriate firewalls, and implement the necessary measures to prevent further disclosure and leak of any additional information;

j. Requiring Defendant to conduct systematic scanning for data breach related issues;

k. Requiring Defendant to train and test its employees regarding data breach protocols, archiving protocols, and conduct any necessary employee background checks to ensure that only individuals with the appropriate training and access may be allowed to access the Private Information data; and,

l. Requiring all further and just corrective action, consistent with permissible law and pursuant to only those causes of action so permitted.

141. The Court can, and should, issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with the law and industry standards to protect Plaintiff's and Class Members' Private Information.

142. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach of the Defendant's systems or networks. The risk of another breach is real, immediate, and substantial.

143. The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. If another data breach occurs, the Plaintiff and the Class will likely be subjected to fraud, identity theft, and other harms described herein. However, the cost to the Defendant of complying with an injunction by employing reasonable prospective

data security measures is minimal given they have preexisting legal obligations to employ these measures.

**COUNT SIX**
**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW**
**BUSINESS & PROFESSIONS CODE SECTION 17200, *et seq.***
**(ON BEHALF OF PLAINTIFF AND THE CALIFORNIA SUBCLASS)**

144. Plaintiff, individually and on behalf of the California Subclass, herein repeats, realleges and fully incorporates all allegations in all preceding paragraphs.

**A. "Unfair" Prong**

145. Under California's Unfair Competition Law, Cal. Bus. & Prof. Code Section 17200, et seq., a challenged activity is "unfair" when "any injury it causes outweighs any benefits provide to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California*, 142 Cal. App. 4th 1394, 1403 (2006).

146. Defendant's conduct as alleged herein does not confer any benefit to consumers. Mishandling this data shows blatant disregard for the privacy and security of consumers.

147. Defendant's conduct as alleged herein causes injuries to consumers, whose data it obtained but failed to protect, and whose Private Information was leaked as a result of Defendant's unlawful conduct.

148. Defendant's failure to implement and maintain reasonable security measures was also contrary to legislatively-declared public policy that seeks to protect consumers' data and ensure entities that are trusted with it use appropriate security measures. These policies are reflected in law, including the FTC Act, 15 U.S.C. §45, California's Customer Records Act, Cal. Civ. Code §1798.81.5, and California's Consumer Privacy Act, Cal. Civ. Code § 1798.100.

149. Plaintiff and the California Subclass cannot avoid any of the injuries caused by Defendant's conduct as alleged herein.

150. The injuries caused by Defendant's conduct as alleged herein outweigh any benefits.

151. Defendant's conduct, as alleged in the preceding paragraphs, is false, deceptive, misleading, and unreasonable and constitutes an unfair business practice within the meaning of California Business and Professions Code § 17200.

152. Defendant could have furthered its legitimate business interests in ways other than its unfair conduct.

153. All of the conduct alleged herein occurs and continues to occur in Defendant's operations as there is no evidence that Defendant has ensured that its computer systems are now secure and that it will be able to keep Plaintiff and the California Subclass Members' Private Information secure. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated consistently.

154. Pursuant to Business and Professions Code Sections 17203, Plaintiff and the California Subclass seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its unfair business practices.

155. Plaintiff and the California Subclass have suffered injury-in-fact and have lost money or property as a result of Defendant's unfair conduct.

156. Pursuant to Business and Professions Code Sections 17203, Plaintiff and the California Subclass seek an order of this Court compelling Defendant to implement adequate safeguards to protect consumer Private Information it retains. This includes, but is not limited to: improving security systems, deleting data that no longer needs to be retained by Defendant, archiving that data on secure servers, adopting adequate and robust training policies and protocols for all employees entrusted with access to Private Information, and notifying all affected consumers in a timely manner.

**B. "Unlawful" Prong**

157. California Business and Professions Code Section 17200, et seq., identifies violations of any state or federal law as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp.,* 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

158. Defendant's unlawful conduct, as alleged in the preceding paragraphs, violates California Civil Code § 1750, *et seq.*

159. Defendant's conduct, as alleged in the preceding paragraphs, is false, deceptive, misleading, and unreasonable and constitutes unlawful conduct.

160. Defendant has engaged in "unlawful" business practices by violating multiple laws, including California's Customer Records Act, Cal. Civ. Code §§ 1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach notification), the FTC Act, 15 U.S.C. § 45, California's Consumer Privacy Act, Cal. Civ. Code § 1798.100, and California common law.

161. Defendant knew or should have known of its unlawful conduct.

162. As alleged in the preceding paragraphs, Defendant's failure to maintain adequate and proper security as detailed above constitutes an unlawful business practice within the meaning of California Business and Professions Code section 17200.

163. Defendant could have furthered its legitimate business interests in ways other than by its unlawful conduct.

164. All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's unlawful conduct is part of a pattern or generalized course of conduct repeated on approximately thousands of occasions daily.

165. Pursuant to Business and Professions Code Sections 17203, Plaintiff and the California Subclass seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its unlawful business practices.

166. Plaintiff and the California Subclass have suffered injury-in-fact and have lost money or property as a result of Defendant's unfair conduct. Plaintiff and California Subclass Members seek an order mandating that Defendant implement adequate security practices to protect members' Private Information. Additionally, Plaintiff and the California Subclass Members seek and request an order awarding Plaintiff and the California Subclass restitution of the money wrongfully acquired by Defendant by means of Defendant's unfair and unlawful practices.

167. Plaintiff and the California Subclass are entitled to equitable relief as no adequate remedy at law exists.

168. Defendant has not yet implemented adequate protections to prevent a future data breach, nor has it given adequate notice to all affected members of the California Subclass, and therefore, the equitable relief requested here would prevent ongoing and future harm;

169. Injunctive relief is also necessary to prevent the members of general public from being misled by Defendant's misrepresentations regarding privacy and security of information;

170. The equitable relief under the UCL (and also under unjust enrichment discussed below) creates a straightforward cause of action for violations of law (such as statutory or regulatory requirements related to representations and omissions made with respect to Defendant's products). Furthermore, damages for non-UCL claims require additional elements or pre-suit notice letters, which would potentially eliminate possibility of providing damages to the entire class, while restitution would provide certainty and remedy for all affected victims.

171. In addition, discovery—which has not yet been provided and/or completed—may reveal that the claims providing legal remedies are inadequate. At this time, forcing an election of remedies at the initial pleadings stage, in the absence of completed discovery regarding class certification and merits, is premature and likely to lead to subsequent, potentially belated, and hotly contested motions to amend the pleadings to add equitable remedies based on a lengthy historical recount of discovery and analysis of voluminous exhibits, transcripts, discovery responses, document productions, etc., as well as related motions to seal confidential information contained therein.

**COUNT SEVEN**
**VIOLATION OF CALIFORNIA'S CUSTOMER RECORDS ACT**
**CALIFORNIA CIVIL CODE § 1798.80, *ET SEQ*.**
**(ON BEHALF OF PLAINTIFF AND THE CALIFORNIA SUBCLASS)**

172. Plaintiff, individually and on behalf of the California Subclass, herein repeats, realleges and fully incorporates all allegations in all preceding paragraphs.

173. "[T]o ensure that Personal Information about California residents is protected," the California Legislature enacted Cal. Civ. Code § 1798.81.5, which requires that any business that "owns, licenses, or maintains Personal Information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the Personal Information from unauthorized access, destruction, use, modification, or disclosure." Furthermore, businesses that maintain computerized data that includes PII are required to "notify the owner or licensee of the information of the breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82(b). Among other requirements, the security breach notification must include "the types of Personal Information that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

174. The Data Breach was a breach of security within the meaning of section 1798.82. PII stolen in the Data Breach constitutes "personal information" within the meaning of section 1798.80(e).

175. Plaintiff and California Subclass Members' PII was maintained by the Defendant and was the subject of the Data Breach. See Cal. Civ. Code § 1798.2.

176. TransUnion is a business within the meaning of Cal. Civ. Code § 1798.80.

177. TransUnion owns, licenses, or maintains personal information about Californians under Cal. Civ. Code § 1798.81.5(a)(1). Such PII includes, but is not limited to, the names, contact information, social security numbers, and other information of Plaintiff and the California Subclass Members. See Cal. Civ. Code §§ 1798.81.5(d)(1)(A)(i).

178. Because Plaintiff and the California Subclass Members' PII was acquired by unauthorized persons during the Data Breach, Defendant had an obligation to disclose the Data Breach immediately following its discovery to the owners or licensees of the PII (i.e., Plaintiff and the California Subclass Members) as mandated by Cal. Civ. Code § 1798.82.

179. The Data Breach occurred on July 28, 2025, and was discovered by Defendant on July 30, 2025, but Defendant did not disclose the Breach to Class Members until August 26, 2025.

180. By failing to disclose the Data Breach immediately following its discovery, Defendant violated Cal. Civ. Code § 1798.82.

181. Defendant's failure to timely notify Plaintiff and the California Subclass of the breach of their PII prevented them from taking the following remedial measures to mitigate their losses and damage from the Data Breach: (1) purchasing identity protection, monitoring, and recovery services; (2) flagging asset, credit, and tax accounts for fraud, including by reporting the theft of their Social Security numbers to financial institutions, credit agencies, and the IRS; (3) purchasing or otherwise obtaining credit reports; (4) placing or renewing fraud alerts on a quarterly basis; (5) intensively monitoring loan data and public records; and (6) taking other steps to protect themselves and attempt to avoid or recover from identity theft.

182. As a direct and proximate result of the Defendant's violations of Cal. Civ. Code §§ 1798.81.5 and 1798.82, Plaintiff and the California Subclass Members suffered damages, as described above and as will be proven at trial.

## COUNT EIGHT
## VIOLATION OF CALIFORNIA CONSUMER PRIVACY ACT
## CALIFORNIA CIVIL CODE § 1798.100
## (ON BEHALF OF PLAINTIFF AND THE CALIFORNIA SUBCLASS)

183. Plaintiff, individually and on behalf of the California Subclass, herein repeats, realleges and fully incorporates all allegations in all preceding paragraphs.

184. TransUnion does business in California by collecting, processing, maintaining, and compiling information on millions of Californians.

185. TransUnion is considered a "business" as that term is defined in Cal. Civ. Code. § 1798.140(c) because it has an annual gross revenue exceeding $25 million and buys, receives, sells, or shares personal information of 50,000 or more consumers, households, or devices.

186. Plaintiff's and California Subclass Members' PII is "nonencrypted and nonredacted personal information" consisting of social security number, dates or birth, names, addresses and

other sensitive personal information. Cal. Civ. Code § 1798.150(a)(1). The Data Breach constitutes "an unauthorized access and exfiltration, theft, or disclosure" pursuant to Cal. Civ. Code § 1798.150(a)(1) because due to Defendant's failure to implement reasonable and necessary security measures, it enabled third party criminals to access personal information and thus, caused unauthorized sharing of Plaintiff's and the California Subclass Members' personal information.

187. Defendant had a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of Plaintiff's and California Subclass Members' PII to protect the PII.

188. Defendant breached the duty it owed to Plaintiff and California Subclass Members described above. Defendant breached these duties by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols and practices sufficient to protect the PII of Plaintiff and California Subclass Members; (b) detect the breach while it was ongoing; and (c) maintain security systems consistent with industry standards.

189. Defendant's breach of the duty it owed to Plaintiff and the California Subclass Members described above was the direct and proximate cause of the Data Breach. As a result, Plaintiff and the California Subclass Members suffered damages, as described above and as will be proven at trial.

190. Plaintiff and the California Subclass Members seek injunctive relief in the form of an order enjoining Defendant from continuing the practices that constituted its breach of the duty owed to the Plaintiff and California Subclass Members as described above

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment and relief on all cause of action as follows:

A. That the Court determines that this Action may be maintained as a Class Action, that Plaintiff be named as Class Representative of the Class, that the undersigned be named as Class Counsel of the Class, and that notice of this Action be given to Class Members;

B. That the Court enter an order declaring that Defendant's actions, as set forth in this Complaint, violate the laws set forth above;

C. That the Court enter an order providing declaratory and injunctive relief including specific steps, as outlined above, requiring Defendant to utilize appropriate methods and policies as necessary to remediate the harm suffered by Plaintiff and the Class members as well as to prevent future harm and properly secure its data;

D. That the Court award Plaintiff and the Class damages (both actual damages for economic and non-economic harm and statutory damages) in an amount to be determined at trial;

E. That the Court issue appropriate equitable and any other relief (including monetary damages, restitution, and/or disgorgement) against Defendant to which Plaintiff and the Class are entitled, including but not limited to restitution and an Order requiring Defendant to cooperate and financially support civil and/or criminal asset recovery efforts;

F. That the Court award Plaintiff and the Class pre- and post-judgment interest (including pursuant to statutory rates of interest set under State law);

G. That the Court award Plaintiff and the Class their reasonable attorneys' fees and costs of suit;

H. That the Court award treble and/or punitive damages insofar as they are allowed by applicable laws; and

I. That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by jury for all claims.

DATED: September 8, 2025

**CLARKSON LAW FIRM, P.C.**

*/s/ Bryan Paul Thompson*

Bryan P. Thompson, Esq. (IARDC #6310322)
CLARKSON LAW FIRM, P.C.
875 North Michigan Avenue, 31st Floor
Chicago, Illinois 60611
Tel.: (312) 267-0061
*bthompson@clarksonlawfirm.com*

Yana Hart, Esq. (*admission forthcoming*)
CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
*yhart@clarksonlawfirm.com*